J-S56012-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JOSHUA ROBINSON | |
| Appellant | No. 3630 EDA 2016 |

Appeal from the Judgment of Sentence November 10, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0004954-2013
CP-51-CR-0004955-2013

BEFORE:  BOWES, STABILE, AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 27, 2017**

Joshua Robinson appeals from the judgment of sentence of 58 and one-half to 117 years incarceration imposed following his convictions for two counts of aggravated assault and robbery, in addition to, *inter alia*, one count of conspiracy to commit robbery and various firearm charges.  We affirm.

The trial court summarized the incident leading to Appellant's conviction in its Pa.R.A.P. 1925(a) opinion as follows.

> [I]n the early morning hours of August 9, 2010, Michael Brown, wanting to purchase thirteen bags of crack cocaine, approached Gloria Alston and inquired if Alston knew someone from whom he could buy drugs. Ms. Alston called Kareem White and set up a meeting for the sale of the drugs to Brown. Kareem White and William Ross drove to the 1100 block of South Sixty-First Street

* Retired Senior Judge specially assigned to the Superior Court.

in Philadelphia as arranged, where Brown approached the passenger side of the car, pulled out money, asked about the drugs, and if they had guns in the car with them. The defendant, Joshua Robinson, suddenly appeared in the middle of the street. Robinson walked slightly past the vehicle, turned and fired twice into the vehicle. Gunfire was returned and Robinson shot three or four more times into the vehicle and fled. White was shot in the back of his head and left torso. Ross suffered a gunshot wound to the back of his head and left hand. White and Ross were transported to the Hospital of the University of Pennsylvania and miraculously, both survived.

Trial Court Opinion, 1/31/17, at 3 (citations to transcript omitted).

We add the following facts. The identity of the shooter remained unknown until 2012, as Kareem White had implicated another man. Kareem testified that he believed Kevin Rogers had set him up for a robbery, as he and Rogers used to sell drugs together. Their illicit partnership ended due to Kareem's dissatisfaction with the quality of Rogers' drugs. On the day of the shootings, Kareem received a call from Gloria Alston, asking if she could purchase $100 worth of cocaine. He agreed, and stated that he would drive to her location.

Kareem, joined by William Ross, arrived and saw Michael Brown, whom Kareem knew to be Kevin's cousin. That man approached the car, and engaged in a conversation with the two dealers. Shortly thereafter, another individual approached the vehicle and started firing a gun. Based on this sequence of events, Kareem believed that Rogers had arranged the shooting, presumably as revenge for severing their drug partnership.

Detective Frank Mullen interviewed Kareem at the hospital a few hours after the shooting. Kareem identified Brown in a photo array and suggested that Detective Mullen speak to Alston. Ms. Alston gave a statement at approximately 9:00 a.m. She told Detective Mullen and his partner, Detective Darryl Pearson, that she regularly used crack cocaine and knew a number of dealers. She would occasionally act as a middleman and arrange drug sales in exchange for some cash or a cut of the drugs. She was hanging out in an apartment when a man who identified himself as Kevin Rogers's cousin, Jasir, arrived and asked Alston to arrange a drug deal. Alston did so, and witnessed Jasir approach the vehicle upon Kareem's arrival. She saw the shooter approach the vehicle and open fire, but did not know the shooter. She identified Jasir in a photo array. Detective Pearson testified that Jasir was, in fact, Michael Brown. Brown was arrested on September 29, 2010, and charged with robbery.

Authorities continued their investigation, largely through investigation of cellular phone records. Meanwhile, in early September of 2010, Abdalah Josma was arrested following a vehicular stop for numerous firearms offenses. Josma spoke to a detective, and stated that Appellant had previously given Josma a firearm. Appellant indicated that he had used this gun to kill two people in a drug deal setup. Josma then showed the authorities that gun, which was a revolver. Detective Mullen explained that

since revolvers do not expel casings, forensic attempts to connect the gun to the shooting would be fruitless.

On March 14, 2012, Brown and his attorney contacted the authorities to offer information, which ultimately led to Appellant's arrest. Brown testified at trial, and related the following. He approached Alston and identified himself as Rogers' cousin, and asked her to arrange a sale. When Brown went outside to wait, he saw Appellant, whom he recognized. Appellant told Brown he was looking to rob someone. Brown informed Appellant that he would be buying some drugs, and told him "after everything I handle is done, you could just go ahead and rob them." He then explained to the jury that he approached Kareem's car, whereupon Appellant approached and fired his gun.

Following a jury trial, Appellant was convicted of the aforementioned charges and sentenced.[1] Appellant filed a timely notice of appeal and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. The trial court authored its opinion in response and the matter is ready for our review. Appellant raises the following two issues.

> I. Did the trial court err and cause irreparable harm to Appellant when the court allowed the Commonwealth to elicit testimony from a witness, Gloria Alston, regarding fears of retaliation when

---

[1] Appellant was acquitted of two counts of attempted homicide.

there was no evidence of any retaliation in relation to Appellant and when the jury could only conclude that Appellant could have been the only one with motive or interest in retaliation?

II. Did the trial court err and cause irreparable harm to Appellant by allowing the Commonwealth to read witness Gloria Alston's out-of-court, hearsay statement into evidence when there was no significant issue with the witness' memory and there was no **Brady**/**Lively** impeachment because there was no evidence that the witness was recanting or disavowing her prior statement?

Appellant's brief at 4.

Both of these claims attack the trial court's decision to admit evidence. The admission of evidence "is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Tyson**, 119 A.3d 353, 357 (Pa. Super. 2015) (citation and quotation omitted). "Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." **Commonwealth v. Huggins**, 68 A.3d 962, 966 (Pa.Super. 2013) (citations and internal quotations omitted).

The first claim involves the prosecutor asking Ms. Alston if she was scared. The pertinent exchange was as follows:

**Q.** [A]re you nervous today?

**A.** Yes, I am very nervous.

**Q.** Are you a little scared today?

**A.** I'm afraid, yes.

[APPELLANT]: Objection, Your Honor.

THE COURT: Overruled.

**Q.** What are you afraid of?

**A.** Retaliation.

[Appellant]: Objection.

THE COURT: Overruled, but that's enough of that.

N.T., 11/2/16, at 107.

Appellant alleges that the trial court erroneously overruled his objection and caused prejudice, as there was no objective evidence of any retaliation. In its Pa.R.A.P. 1925(a) opinion, the trial court states that Ms. Alston "was obviously distressed at testifying in open court and the exchange with Ms. Alston was merely an explanation as to why the witness was acting as she was on the witness stand." Trial Court Opinion, 1/31/17, at 4-5.

We find that the court did not abuse its discretion. We addressed a substantially similar set of circumstances in **Commonwealth v. Bryant**, 462 A.2d 785 (Pa.Super. 1983), and opined that evidence of a witness's subjective fear are permissible to explain aspects of the witness's testimony:

> In general, "'threats by third persons against ... witnesses are not relevant [and thus not admissible into evidence] unless ... the defendant is linked in some way to the making of the threats.'" **Commonwealth v. Carr**, 436 Pa. 124, 127, 259 A.2d 165, 167 (1969) (citation omitted). Nevertheless, an exception to the rule exists where the evidence in question was not offered

- 6 -

> to prove the accused's guilt "but to explain a [witness's] prior inconsistent statement."
>
> In the present case the Commonwealth witness revealed his subjective fear that Appellant or Appellant's family **might** threaten him or his family if he testified against Appellant. The witness did not intimate that he had actually received threats from any source. Furthermore, the testimony concerning possible threats was not introduced to establish Appellant's guilt but was adduced to reconcile the inconsistencies in the witness's pre-trial and at-trial statements.

*Id*. at 788 (emphasis in original, some citations omitted). Likewise, the trial court permitted the testimony as a way of explaining Ms. Alston's demeanor and behavior on the stand. Furthermore, Ms. Alston did not state that she was actually threatened, only that she subjectively feared that retaliation could occur. We therefore find no error.

The second issue concerns a lengthy question to Ms. Alston, which involved reading the entire content of her statement to Detective Mullen. However, we note that prior to taking that action, the Commonwealth attempted to refresh her recollection as indicated by the following exchange:

**Q.** Okay. I'm going to step back just a little bit. This guy Michael Brown, did you know a guy named Kev who lived on that same block?

**A.** Yeah.

**Q.** Did Michael Brown ever, I guess, was it ever told to you that Michael Brown was Kev's cousin?

**A.** No.

**Q.** No?

- 7 -

**A.** No.

N.T., 1/31/16, at 106. The prosecutor then offered Ms. Alston a document, which Ms. Alston recognized as having reviewed previously with the prosecutor in preparation of her testimony. She reviewed the statement and acknowledged that the document was the statement she gave to Detective Mullen:

**Q.** . . . And [Detective Mullen] had asked you questions. Is that fair?

**A.** Right.

**Q.** That night?

**A.** Yes.

**Q.** And the first few pages are the ***Miranda*** warnings that he gave you. He told you all your rights and all that kind of stuff?

**A.** Uh-huh.

**Q.** Is that right?

**A.** Right.

**Q.** Okay. And then I read to you the first, I read to you your whole statement.

**A.** Right.

**Q.** Earlier today.

**A.** Yes.

**Q.** When we were at lunch.

**A.** Yes.

**Q.** Okay. And all of that was true and correct to the best of your memory. Is that fair?

**A.** Right.

*Id*. at 109-110.   The Commonwealth then read an answer from the statement, wherein Ms. Alston stated that Jasir (a/k/a Michael Brown) had in fact identified himself as Kevin's cousin.   Ms. Alston responded that she did not remember saying that.   Examination continued, and Ms. Alston again experienced difficulties recalling certain details, prompting the prosecutor to again reference the prior statement, this time by directly reading what the statement said.

**Q.** Okay. And do you know where Reem lived?

**A.** No.

**Q.** Okay. Do you remember telling Detective Mullen that Reem lived right next door to Kev?

**A.** I don't remember.

**Q.** Okay. Let's just go right here. Court's indulgence. Well, let's go back. Miss Alston, the first question that the detective asked you was, "Tell me what you can about what happened outside of eleven hundred South Sixty-First Street on 8/9/10 at approximately 12:40 a.m. from the beginning." You give a very, very long answer. It starts on page one and ends on page two; is that correct?

**A.** I guess.

**Q.** Okay. Let's go to page three.

**Question**: "When Jasir went to visit" --

> [APPELLANT]: Objection. I don't know what. Is she being impeached? I think she said she doesn't remember. If she doesn't remember, she can look at it, review it and see if it refreshes her memory, but she can't be read the question.

*Id*. at 114-15. The trial court overruled the objection, and the prosecutor then read the statement in full, reciting the questions and answers given, which occupied eight pages of transcript. After reading the entire statement, the prosecutor concluded with, "Miss Alston, I just read you that whole thing. Do you remember giving that answer?" The witness responded, "Most of it." The prosecutor then asked, "When you say most of it, what is it? What's different that you don't? I guess, what do you not remember?" *Id*. at 124.

As indicated by the objection, Appellant insisted that the proper course was to show Ms. Alston the statement to see if it refreshed her recollection. Appellant argues that the trial court abused its discretion because "there was no significant issue with the witness's memory and . . . there was no evidence that the witness was recanting or disavowing her previous statement." Appellant's brief at 10.

The Commonwealth responds that the trial court properly permitted the prosecutor to read the questions and answers pursuant to Pa.R.E. 803.1(3), which states:

> **(3) Recorded Recollection of Declarant-Witness.** A memorandum or record made or adopted by a declarant-witness that:

(A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;

(B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and

(C) the declarant-witness testifies accurately reflects his or her knowledge at the time when made.

If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party.

Pa.R.E. 803.1(3).

We agree that the trial court did not abuse its discretion in permitting the Commonwealth to read the questions and answers, as all three requirements were met. First, a review of Ms. Alston's testimony, as excerpted *supra*, plainly establishes that she could not recall the details of her statement, which was given approximately six years before her in-court testimony. Second, the prosecutor asked the witness if her prior statements reflected "what happened that night" to which Ms. Alston stated, "Yeah." Finally, Ms. Alston conceded that she reviewed her statement with the prosecutor in preparation for her testimony, and agreed when asked, "And all of that was true and correct to the best of your memory. Is that fair?"

Accordingly, we disagree with Appellant's assertion that there was no significant issue with the witness's memory. In this vein, we note that in *Commonwealth v. Shelton*, 170 A.3d 549 (Pa.Super. 2017), we affirmed the trial court's decision to permit introduction of prior statements in a

videotaped interview pursuant to this same hearsay exception. With respect to whether the witness evidenced any difficulties recalling the details of previous statements, we specifically noted that the witness admitted to memory issues but would nevertheless answer questions:

> At trial, the victim acknowledged that her memory of events was "much better then [.]" Importantly, she informed the court that when the Commonwealth asked her a question at trial to which she could not recall the answer, she would say "no," rather than admit that she did not recall. Although the victim was able to testify at trial about many details of the abuse by her father, from our review of the transcribed portions of the video recording we discern that the victim reported the events of abuse more fully, with a greater level of detail, at her forensic interview. **The victim testified that there were times during her testimony when she did not recall the answer to a question posed by the Commonwealth but instead of admitting as such, she answered the question in the negative**.

*Id*. at 552–53 (citations to transcript omitted, emphasis added). The same is true here; Ms. Alston simultaneously admitted that she could not recall the particular answers given, but nevertheless answered many questions as if she recalled all details. Hence, we cannot conclude that the trial court abused its discretion in permitting the Commonwealth to read the statement to the witness.

Additionally, we add that by asking Ms. Alson if she had any corrections or anything to add regarding the statement, the prosecutor effectively gave the witness an opportunity to explain anything that was

incorrect in the statement, as opposed to introducing the statement as substantive evidence. Therefore, we find no error.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/27/2017*